RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0004p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

               *Plaintiff-Appellee*,

    *v.*

                        No. 18-5216

ANDREW BLAKE MOOREHEAD,

               *Defendant-Appellant*.

_____

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:15-cr-10077-1—S. Thomas Anderson, District Judge.

Argued:  December 6, 2018

Decided and Filed:  January 9, 2019

Before:  COLE, Chief Judge; GRIFFIN and KETHLEDGE, Circuit Judges.
_____

## COUNSEL
_____

**ARGUED:**  M. Dianne Smothers, FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant.  Debra L. Ireland, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.  **ON BRIEF:**  M. Dianne Smothers, FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant.  Debra L. Ireland, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

_____

## OPINION
_____

COLE, Chief Judge.  This case is one of many that have arisen from the government's investigation into a child pornography website known as "Playpen."  Andrew Moorehead was indicted for possession and receipt of child pornography based on his activity on the website.

He moved to suppress the evidence against him, arguing that it was obtained as a result of an invalid warrant.  The district court denied his motion, and Moorehead now appeals.  Because the good-faith exception to the exclusionary rule applies, we affirm.

I.

In December 2014, a foreign law enforcement agency informed the FBI of its suspicion that an IP address in the United States was associated with Playpen.  After accessing Playpen and verifying the nature of its contents, the FBI obtained and executed a search warrant at Centrilogic, a server hosting company in North Carolina that owned the IP address.  The FBI seized the server that was assigned the relevant IP address and confirmed that it contained a copy of Playpen.  The agents relocated a copy of the server to a government facility in Newington, Virginia.  Because of a server misconfiguration, the government was able to identify the administrator of Playpen and gain administrative control of the website.  For approximately two weeks, the FBI continued to operate Playpen from a government-controlled computer server at its facility in Newington.

Even with administrative control, however, the government was unable to identify the individuals who logged into Playpen because the website operates on the Onion Router ("Tor")—an anonymity network that masks computer users' IP addresses.  Ordinarily, when the government seizes control of an illicit website, law enforcement officers can access the website's IP log—which records the IP addresses that have accessed the website—and use the log to locate and apprehend the website's users.  But because Playpen was operating on Tor, the IP addresses of the users were hidden, and traditional investigative techniques were unavailable.

To combat the problem of user anonymity, the FBI turned to counter-technology called the Network Investigative Technique ("NIT").  The NIT works as follows:

- When a user logs into Playpen by entering a username and password, the NIT is downloaded on the user's computer.

- Once downloaded, the NIT obtains the following information from the user's computer:  (1) the IP address; (2) a unique identifier that distinguishes the data from that of other computers; (3) the type of operating system; (4) information regarding whether the NIT has already been delivered to that computer; (5) the

Host Name; (6) an active operating system username; and (7) a Media Access Control address.

• That information is then sent to a computer controlled by the government in Newington.

The government sought a warrant in the Eastern District of Virginia authorizing use of the NIT. Specifically, the warrant sought to "cause an activating computer – *wherever located* – to send [identifying information] to a computer controlled by or known to the government." (Mot. Suppress, Ex. 3, R. 45-3, PageID 452) (emphasis added.) The affidavit in support of the warrant described the large number of Playpen users: "[O]ver 1,500 unique users visit[] the website daily and over 11,000 unique users visit[] the website over the course of a week." (*Id.* at PageID 441.) On February 20, 2015, a magistrate judge in the Eastern District of Virginia signed a warrant authorizing the government to deploy the NIT on "any user or administrator who logs into [Playpen] by entering a username and password" (the "NIT Warrant"). (*Id.* at PageID 421–422.)

Between March 1, 2015 and March 5, 2015, a user named "logidragon321" logged into Playpen for a little over three and a half hours. On March 2, 2015, while "logidragon321" was logged into Playpen, law enforcement personnel deployed the NIT and identified the IP address associated with the username. An administrative subpoena was sent to Jackson Energy Authority, the Internet Service Provider that operated the IP address. The subpoena response indicated that Rebecca Moorehead was paying for the Internet service at a residence in Tennessee, and an open source database revealed that she and Andrew Moorehead were the occupants of the residence.

On September 22, 2015, the government obtained a residential warrant for the Moorehead property, and officers executed the warrant on September 24, 2015, seizing Andrew Moorehead's computer equipment. During the execution of the search warrant, Moorehead admitted that he used the Internet to view child pornography and that "logidragon321" was his user name.

Moorehead was indicted by a federal grand jury for one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and one count of receipt of child

pornography in violation of 18 U.S.C. § 2252(a)(2).  He filed a motion to suppress the evidence obtained from the government's use of the NIT, arguing that the NIT Warrant violated Federal Rule of Criminal Procedure 41 and 28 U.S.C. § 636(a) because it was executed outside of the magistrate judge's territorial jurisdiction.  On June 6, 2017, the district court denied Moorehead's motion to suppress.

Subsequently, Moorehead pleaded guilty to receipt of child pornography and the government agreed to dismiss the possession charge.  The plea agreement reserved Moorehead's right to appeal the denial of his motion to suppress.

On February 27, 2018, Moorehead was sentenced to 97 months' imprisonment.  Moorehead filed a timely notice of appeal the following day.

## II.

On appeal from the denial of a motion to suppress, "we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Buford*, 632 F.3d 264, 268 (6th Cir. 2011) (citation omitted).  The evidence is reviewed "in the light most likely to support the district court's decision." *United States v. Powell*, 847 F.3d 760, 767 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 143 (2017) (citations omitted).  "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994).

Moorehead first argues that the magistrate judge violated Federal Rule of Criminal Procedure 41(b) by signing the NIT Warrant.  That rule gives a magistrate judge authority to issue warrants for people or property located within her district.  In 2015, when the magistrate judge issued the NIT Warrant, Rule 41(b) provided four exceptions to the requirement that a search warrant be issued within a magistrate judge's district.  Relevant here is the exception for "tracking devices":  the government contends the NIT is analogous to a tracking device and thus argues that the warrant was authorized at the time it was issued.  *See* Fed. R. Crim. P. 41(b)(4).  After the warrant was issued, Rule 41(b) was amended to add an additional exception to a magistrate judge's territorial limitations, one that indisputably authorizes warrants like the NIT Warrant.  But Moorehead contends that no exceptions authorized the NIT Warrant in 2015,

arguing (persuasively) that the NIT is not a tracking device.  He thus contends that the magistrate judge violated Rule 41, rending the warrant invalid.  He further contends that such violation is of constitutional magnitude and that the NIT Warrant is void ab initio.  But we need not decide these issues.  We conclude that even if the NIT Warrant runs afoul of the Fourth Amendment, the good-faith exception to the exclusionary rule applies to preclude suppression.

Suppression is not an automatic consequence of a Fourth Amendment violation.  Indeed, the Fourth Amendment "says nothing about suppressing evidence obtained in violation of [its] command."  *Davis v. United States*, 564 U.S. 229, 236 (2011).  Nonetheless, the Supreme Court created the exclusionary rule—a prudential doctrine which prohibits "evidence obtained in violation of the Fourth Amendment [from] be[ing] used in a criminal proceeding against the victim of the illegal search and seizure."  *United States v. Calandra*, 414 U.S. 338, 347 (1974).  Exclusion of evidence under the rule "is not a personal constitutional right" nor is it "calculated to redress the injury to the privacy of the victim of the search."  *Stone v. Powell*, 428 U.S. 465, 486 (1976).  Rather, the rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect."  *Calandra*, 414 U.S. at 348.  As the Supreme Court has "repeatedly held," the rule's "sole purpose . . . is to deter future Fourth Amendment violations."  *Davis*, 564 U.S. at 236–37 (citing *Herring v. United States*, 555 U.S. 135, 141, and n.2 (2009); *United States v. Leon*, 468 U.S. 897, 909, 921 n.22 (1984); *Elkins v. United States*, 364 U.S. 206, 217 (1960)).  Thus, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies."  *Herring*, 555 U.S. at 140.

Instead, courts must ask whether "the deterrence benefits of suppression . . . outweigh its heavy costs."  *Davis*, 564 U.S. at 237; *see also Buford*, 632 F.3d at 270 ("[T]he Court has made clear that the benefits of deterrence must outweigh the costs in order to warrant the exclusion of evidence obtained in violation of the Fourth Amendment.") (citations omitted).  "Where suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted."  *Davis*, 564 U.S. at 237 (citations and brackets omitted).  In the deterrence analysis, courts must consider the culpability of the law enforcement conduct at issue:

> [T]he deterrence benefits of exclusion vary with the culpability of the law
> enforcement conduct at issue.  When the police exhibit deliberate, reckless, or
> grossly negligent disregard for Fourth Amendment rights, the deterrent value of

exclusion is strong and tends to outweigh the resulting costs.  But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way.

*Id.* at 238 (citations and brackets omitted).

The Supreme Court thus has created a "good-faith" exception to the exclusionary rule: the introduction of evidence obtained in violation of the Fourth Amendment is permitted in criminal trials when the evidence is "obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *Leon*, 468 U.S. at 909 (citations omitted); *see also Herring*, 555 U.S. at 142 ("We (perhaps confusingly) call[] . . . objectively reasonable reliance 'good faith.'").  "Following *Leon*, courts presented with a motion to suppress [challenging a warrant] must ask whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (citations omitted).  *Leon* delineated at least four instances in which a well-trained officer would have known a search was illegal, thus barring application of the good-faith exception:

> [1] [I]f the magistrate . . . was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth . . . [2] where the issuing magistrate wholly abandoned [her] judicial role . . . [3] [where] a warrant [is] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable . . . [and [4] where] a warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

468 U.S. at 923.  In "most . . . cases," however, when an officer "obtained a search warrant from a judge or magistrate and acted within its scope," the good-faith exception applies.  *Id.* at 920–21; *see also United States v. Fisher*, 745 F.3d 200, 203 (6th Cir. 2014) ("Exclusion has always been our *last resort*, not our first impulse.") (emphasis in original) (citations and brackets omitted).

Moorehead argues that his case is unlike most because, he says, the NIT Warrant was void from the beginning and therefore had no legal effect.  He contends that the good-faith

exception is categorically inapplicable to warrants that are void ab initio as a result of a jurisdictional defect. We disagree.

The good-faith exception is not concerned with whether a valid warrant exists, but instead asks whether a reasonably well-trained officer would have known that a search was illegal. *See White*, 874 F.3d at 496. The Supreme Court has made this clear time and time again, applying the good-faith exception in a variety of contexts, including in cases where a warrant did not exist at the time of a search. For instance, in *Arizona v. Evans*, the Court found that the good-faith exception applied when officers executed a search based on a warrant that was quashed seventeen days prior to the defendant's arrest. 514 U.S. 1, 4, 6 (1995). Similarly, in *Herring*, the Supreme Court applied the exception when an officer executed a warrant that had previously been recalled. 555 U.S. at 137–39. We see no difference between a warrant that does not exist at the time of a defendant's arrest, like the warrants in *Evans* and *Herring*, and a warrant that is void ab initio because of a jurisdictional defect.

Indeed, we relied on *Herring* in holding that the good-faith exception applies when a state judge issues a warrant outside of her territorial jurisdiction. *See United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010). In *Master*, a state court judge in Franklin County, Tennessee issued a warrant for property that was actually located in Coffee County, Tennessee. *Id.* at 238. Under Tennessee law, judges do not have jurisdiction to authorize a warrant for a search in a different county. *Id.* at 239. After concluding that the warrant was void ab initio and violated the Fourth Amendment, we considered whether the good-faith exception was foreclosed in light of the determination that the judge had no authority to issue the warrant. *Id.* at 239–41. We found that it was not. *Id.* at 242–43. In doing so, we rejected a broad interpretation of our decision in *United States v. Scott*, 260 F.3d 512, 515 (6th Cir. 2001) where we held that the good-faith exception did not apply to a warrant signed by a person lacking the requisite legal authority. We explained:

> Th[e] language [in *Herring*] is contrary to a foundational assumption of the opinion in *Scott* that: "Subject to a few exceptions, the exclusionary rule requires the suppression of evidence obtained in violation of the Fourth Amendment." *Scott,* 260 F.3d at 514. Whereas *Scott* effectively required the government to qualify for an exception to the general rule of suppression, the Supreme Court has since emphasized that the decision to exclude evidence is divorced from whether

a Fourth Amendment violation occurred. *See Herring*, [555 U.S. at 140]. The exclusionary rule's purpose is instead "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." [*Id.* at 144]. Furthermore, the Court noted that the "exclusionary rule was crafted to curb police rather than judicial misconduct." *Id.* at [142]. Arguably, the issuing magistrate's lack of authority has no impact on police misconduct, if the officers mistakenly, but inadvertently, presented the warrant to an incorrect magistrate.

*Master*, 614 F.3d at 242. We therefore found that *Herring* required us to conclude that the good-faith exception is not foreclosed when a warrant is issued outside of a state court judge's jurisdiction. *Id.* at 243.

For the same reasons articulated in *Master*, we conclude that the good-faith exception is not categorically inapplicable to warrants found to be void ab initio. The difference between a state court judge acting without authority and a federal magistrate judge acting without authority is of little significance—in both instances, the individual who signed the warrant (arguably) had no power to do so. *Master*'s holding that the good-faith exception applies to one applies with equal force to the other. Accordingly, the good-faith exception to the exclusionary rule is not categorically inapplicable to warrants that are void ab initio because of a magistrate judge's jurisdictional error. Our decision is in accord with the seven other circuits to have decided this very issue, many of whom relied on our decision in *Master*. *See United States v. Levin*, 874 F.3d 316, 318 (1st Cir. 2017); *United States v. Werdene*, 883 F.3d 204, 216–17 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 260 (2018); *United States v. McLamb*, 880 F.3d 685, 691 (4th Cir. 2018); *United States v. Kienast*, 907 F.3d 522, 527–28 (7th Cir. 2018); *United States v. Horton*, 863 F.3d 1041, 1051 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 1440 (2018); *United States v. Henderson*, 906 F.3d 1109, 1118 (9th Cir. 2018); *United States v. Workman*, 863 F.3d 1313, 1317 (10th Cir. 2017).

Having determined that the good-faith exception applies to warrants that are void ab initio, only one question remains: Does the good-faith exception apply here so as to preclude suppression? We conclude that it does.

Moorehead challenges the district court's application of the *Herring* balancing test, arguing first that the district court incorrectly reasoned that the amendment to Rule 41(b) makes

deterrence unnecessary.  But the district court was correct.  While it is certainly arguable that the magistrate judge did not have authority to sign the NIT Warrant under the version of Rule 41(b) in effect in 2015, it is undisputed that the 2016 amendment to Rule 41 specifically authorizes warrants like the NIT Warrant.  The amendment, effective December 1, 2016, gives "a magistrate judge with authority in any district where activities related to a crime may have occurred" the authority to "issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if . . . the district where the media or information is located has been concealed through technological means." Fed. R. Crim. P. 41(b)(6).

The parties do not dispute that the NIT Warrant is explicitly authorized by this new exception.  Moorehead only argues that the NIT Warrant itself could still be used to prosecute hundreds, if not thousands, more defendants.  But the *Herring* analysis requires us to look at whether suppression would "deter[] Fourth Amendment violations *in the future*."  555 U.S. at 141 (emphasis added).  Because magistrate judges now have the authority to issue warrants like the NIT Warrant, suppressing evidence in this case would not result in appreciable deterrence in the future.

Moorehead next contends that no reasonable officer could have believed in good faith that the NIT Warrant was valid.  He does not make any credible argument that any of the four circumstances enumerated in *Leon* apply.  Instead, he argues that the officers must have known that the NIT Warrant was not authorized under Rule 41 at the time they obtained it because of a memorandum addressed to the Committee on Rules of Practice and Procedure, dated May 5, 2014, that proposed the amendment that ultimately became Rule 41(b)(6).  Moorehead argues that the proposal, which had its origins from a letter from the Acting Assistant Attorney General, shows that the government, including high-level officials, knew that the current version of Rule 41(b) did not authorize the NIT Warrant.  He also points out that the officers obtained a general "Search and Seizure Warrant," rather than the specialized "Tracking Warrant," that they presumably would have sought if they believed that Rule 41(b)(4) authorized the warrant.

But reasonable jurists have come to different conclusions about whether the NIT Warrant was valid. *Compare United States v. Austin*, 230 F. Supp. 3d 828, 833 (M.D. Tenn. 2017) (finding the NIT Warrant does not violate Rule 41(b) because it is the equivalent of a "tracking device" and therefore falls under the ambit of Rule 41(b)(4)), *with United States v. Croghan*, 209 F. Supp. 3d 1080, 1089 (S.D. Iowa 2016) (concluding that the magistrate judge lacked authority to issue the NIT Warrant), *overruled on other grounds by Horton*, 863 F.3d at 1052. We cannot, therefore, expect officers to have known that this type of warrant was invalid at the time it was sought. *See Workman*, 863 F.3d at 1321 ("[I]f a violation took place, it has escaped the notice of eight federal judges who have held that the same warrant complied with federal law and the federal rules even though data was being extracted from computers outside the Eastern District of Virginia. . . . [E]xecuting agents could reasonably have made the same mistake and reasonably relied on the magistrate judge's decision to issue the warrant.").

Indeed, the magistrate judge who issued the NIT Warrant concluded (whether correctly or not) that she had jurisdiction. The Supreme Court's precedent on the exclusionary rule is clear: suppression must deter "police rather than judicial misconduct." *Master*, 614 F.3d at 242 (citing *Herring*, 55 U.S. at 142); *see also Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) ("The exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.") (citations omitted); *Davis*, 564 U.S. at 246 ("[W]e have said time and again that the *sole* purpose of the exclusionary rule is to deter misconduct by law enforcement.") (emphasis in original). The fact that any jurisdictional error here was made by the magistrate, coupled with the fact that Rule 41(b) has been amended to authorize warrants like the one at issue, means "the benefits of deterrence" cannot "outweigh the costs." *Master*, 614 F.3d at 243 (citing *Herring*, 55 U.S. at 141).

Moorehead contends that the good-faith exception has swallowed the exclusionary rule. But Supreme Court precedent dictates that the good-faith exception applies here. All seven appellate courts to have considered the issue—on facts Moorehead concedes are virtually identical to his case—have come to the same conclusion. *Levin*, 874 F.3d at 324; *Werdene*, 883 F.3d at 218; *McLamb*, 880 F.3d at 690; *Kienast*, 907 F.3d at 528, *Horton*, 863 F.3d at 1051; *Henderson*, 906 F.3d at 1120; *Workman*, 863 F.3d at 1321. We now join them.

III.

We affirm the judgment of the district court.