TJOFLAT, Circuit Judge, concurring in part and dissenting in part:[1]
As the majority points out, we are far from the first court to consider whether the NIT warrant passes constitutional muster. I agree with the majority that it does not. The majority also adds its voice to the unanimous chorus of ten other courts of appeals who have found that, regardless of any constitutional infirmity, the exclusionary rule should not apply. On this point, I must respectfully dissent.
The evidence obtained as a result of the NIT warrant should be suppressed because the law enforcement officials who sought the warrant are not entitled to the good faith exception. The officials knew or should have known that there was an issue with jurisdiction and that the search would occur outside the district. Yet, the officials told the magistrate repeatedly that the search would take place in the district.[2] If the law condones this conduct, it makes a mockery of the warrant process.
I.
First, some background on the exclusionary rule. The purpose of the exclusionary rule "is to deter future Fourth Amendment violations." Davis v. United States , 564 U.S. 229, 236-37, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). But the point is "to deter police misconduct rather than to punish the errors of judges and magistrates." United States v. Leon , 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
Courts look to all the officials involved in the warrant process, including those who sought the warrant in the first place. Id. at 923 n.24, 104 S.Ct. 3405 ("It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination."). In this case, the officials who sought the warrant include, at least, the FBI agent who submitted the warrant application and the Assistant U.S. Attorney who reviewed it.
Whether to invoke the exclusionary rule turns largely on "the flagrancy of the police misconduct." See id. at 911, 104 S.Ct. 3405 ; see also Herring v. United States , 555 U.S. 135, 143, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). Courts ask whether law enforcement officials knew or should have known that their conduct was unconstitutional. See Herring , 555 U.S. at 143, 129 S.Ct. 695 (citing Illinois v. Krull , 480 U.S. 340, 348-49, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) ).
Their conduct is evaluated under an objective reasonableness standard: "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances," including this "particular officer's knowledge and experience." Id. at 145, 129 S.Ct. 695 (quotation omitted). This standard "requires officers to have a reasonable knowledge of *1294 what the law prohibits." Leon , 468 U.S. at 919 n.20, 104 S.Ct. 3405.
If, under this standard, courts determine that law enforcement's conduct was deliberate, reckless, or grossly negligent, exclusion is likely warranted. Davis , 564 U.S. at 238, 131 S.Ct. 2419. Alternatively, if law enforcement reasonably relied on a warrant, Leon , 468 U.S. at 922, 104 S.Ct. 3405, or on binding judicial precedent, Davis , 564 U.S. at 249-50, 131 S.Ct. 2419, exclusion is not warranted. This is the so-called good faith exception, and it makes sense: if law enforcement acted in objectively reasonable reliance, the conduct was not culpable-i.e., it wasn't deliberate, reckless, or grossly negligent-so there is no misconduct to deter.
That does not mean that whenever law enforcement obtains a warrant, the good faith exception applies. For example, if law enforcement officials misled the magistrate in the warrant application with material information that they knew or should have known was false, they are not entitled to good faith. Leon , 468 U.S. at 923, 104 S.Ct. 3405 ("Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."). That is what happened here.
There is no question that law enforcement made a false representation in the NIT warrant application. On the application, the FBI agent told the magistrate, in no uncertain terms, that the property to be searched would be "located in the Eastern District of Virginia." Of course, it is "undisputed" that the search did not take place within the district. Maj. Op. at 1285. Thus, the issue is whether the officials seeking the warrant made this false representation deliberately or recklessly. This issue turns on what a reasonable officer standing in the shoes of the officials in this case knew or should have known. For this determination, we must consider the totality of the circumstances.
II.
A.
When the totality of the circumstances is considered, I have little doubt that a reasonable FBI agent and federal prosecutor should have known there was a jurisdictional problem. See United States v. Martin , 297 F.3d 1308, 1318 (11th Cir. 2002) (holding that courts "can look beyond the four corners of the affidavit and search warrant to determine whether" the good faith exception applies). Specifically, the Justice Department's efforts to change the Federal Rules of Criminal Procedure in the wake of a similar failed FBI warrant application in Texas should have made it clear that jurisdiction would likely be an issue with the NIT warrant.
In 2013-two years before the warrant application in this case-the FBI applied to a magistrate judge in Texas for a strikingly similar warrant. See In re Warrant to Search a Target Comput. at Premises Unknown , 958 F. Supp. 2d 753, 755 (S.D. Tex. 2013). The FBI was attempting to identify "[u]nknown persons" who committed bank fraud and identity theft using "an unknown computer at an unknown location." Id. The warrant sought authorization to "surreptitiously install" software on the target computer that would extract certain information and send it back to "FBI agents within this district." Id.
In a published decision, the magistrate denied the warrant application because the search of the target computer would not take place within the district. See id. at 756-58. The court explained its decision: "Since the current location of the Target Computer is unknown, it necessarily follows that the current location of the information *1295 on the Target Computer is also unknown. This means that the Government's application cannot satisfy the territorial limits of Rule 41(b)(1)."[3] Id. at 757. The same logic applies to the NIT warrant.
Notably, unlike this case, the FBI addressed the jurisdictional issue in its supporting affidavit to the Texas magistrate. See id. at 756. The FBI "readily admit[ted] that the current location of the Target Computer [was] unknown," but nevertheless maintained that the search would comply with Rule 41(b)(1) " 'because information obtained from the Target Computer will first be examined in this judicial district.' " Id. (quoting the FBI's affidavit). The magistrate rightly rejected the FBI's argument, pointing out that it would "stretch the territorial limits of Rule 41(b)(1)" to absurd lengths: "By the Government's logic, a Rule 41 warrant would permit FBI agents to roam the world in search of a container of contraband, so long as the container is not opened until the agents haul it off to the issuing district." Id. at 757.
The point is that there was federal precedent addressing the precise jurisdictional issue raised by the NIT warrant. Thus, it is not true, as several of our sister circuits have suggested, that the jurisdictional issue was a "novel question ... for which there was no precedent on point." United States v. Levin , 874 F.3d 316, 323 (1st Cir. 2017) ; see also United States v. McLamb , 880 F.3d 685, 691 (4th Cir. 2018) (stating that officials seeking the NIT warrant were "[w]ithout judicial precedent for reference"), cert. denied , --- U.S. ----, 139 S. Ct. 156, 202 L.Ed.2d 95 (2018).
Since the FBI sought the warrant in the Texas case, it seems to fair to say that a reasonable FBI agent seeking a similar warrant should have been aware of the issues presented by remote searches of unknown sources. Granted, the FBI is a large organization, but the universe of people involved in these cutting-edge search warrants designed to uncover anonymous computer users is surely much smaller. Plus, we know that "the FBI consulted with attorneys at the ... FBI's Remote Operations Unit" before applying for the warrant. McLamb , 880 F.3d at 689. Additionally, a reasonable federal prosecutor who did any research into the legal issues raised by the NIT warrant should have come across the Texas case, so the Assistant U.S. Attorney who reviewed the warrant should have known about it. Thus, because of the Texas case, the officials applying for the NIT warrant should have been aware that there was a potential problem with the magistrate's jurisdiction to issue the warrant.
Of course, a magistrate's decision in Texas, even in a published opinion, is not binding precedent for a warrant application in Virginia. I do not suggest that the Texas case foreclosed officials from applying for the NIT warrant. Prosecutors and the FBI could honestly "believe that reasonable magistrate judges could differ on the legality of the NIT." United States v. Werdene , 883 F.3d 204, 218 n.12 (3d Cir. 2018), cert. denied , --- U.S. ----, 139 S. Ct. 260, 202 L.Ed.2d 174 (2018). For that reason, it would have been perfectly acceptable for these officials to have applied for the NIT warrant and explained to the magistrate why they believed there was jurisdiction. But it was unacceptable to ignore the jurisdictional issue altogether-to repeatedly assert that the search was within the district and fail to mention to the magistrate the problems that led another *1296 judge to deny a substantially similar warrant.[4]
Moreover, the Texas case was not an isolated occurrence. It had far-reaching consequences that make it almost unthinkable that the officials seeking the NIT warrant were unaware of the jurisdictional problem.
Less than six months after the Texas decision, the Justice Department sent a letter to the Advisory Committee on the Criminal Rules urging it to amend the rules to allow for warrants like the one sought in the Texas case. Letter from Mythili Raman, Acting Assistant Att'y Gen., to Hon. Reena Raggi, Chair, Advisory Comm. on the Crim. Rules (Sept. 18, 2013). Specifically, the Justice Department proposed amending " Rule 41 of the Federal Rules of Criminal Procedure to update the provisions relating to the territorial limits for searches of electronic storage media." Id. The amendment would permit magistrate judges to issue warrants for remote searches for "crimes involving Internet anonymizing technologies." Id. The letter cited the Texas case to justify the rule change. Id.
While the committee considered the proposed amendment, the Justice Department continued to advocate for the change and submitted several memorandums defending the amendment. In one memo, dated about two months before the NIT warrant, the Justice Department explained as an example that the amendment would "ensure that a court is available" to issue warrants "investigating members of a child pornography group" using "the Tor network[ ] to hide from law enforcement." Memorandum from David Bitkower, Deputy Assistant Att'y Gen., to Hon. Reena Raggi, Chair, Advisory Comm. on the Crim. Rules (Dec. 22, 2014). These warrants would authorize "the use of the NIT" to "identify the location of the individuals accessing the site." Id. Sound familiar?
Ultimately, the committee recommended adopting the amendment, which became effective on December 1, 2016. Memorandum from Hon. Reena Raggi, Chair, Advisory Comm. on Crim. Rules, to Hon. Jeffrey S. Sutton, Chair, Comm. on Rules of Practice and Proc. (May 6, 2015). The Justice Department's extensive involvement in the rule change-including the two highest ranking officials in the Criminal Division-makes it hard to accept that none of the Justice Department officials involved in the NIT warrant was aware of the jurisdictional issue.[5]
The Justice Department had a number of connections to the NIT warrant. First of all, there is the Assistant U.S. Attorney *1297 who reviewed the warrant application. The FBI also "consulted with attorneys at the [Department's] Child Exploitation and Obscenity Section" before applying for the warrant. McLamb , 880 F.3d at 689. Significantly, as part of the same investigation of Playpen, the FBI and the Justice Department applied for a wiretap order on the same day that they applied for the NIT warrant. The wiretap order was to monitor the private message and chat activity on Playpen. The affidavit supporting the wiretap application included a thorough discussion of the NIT warrant. The same Assistant U.S. Attorney who reviewed the NIT warrant applied for the wiretap order, along with a trial attorney for the Department's Child Exploitation and Obscenity Section. And the Deputy Assistant Attorney General for the Criminal Division approved the wiretap application. Between the Texas case and the rule change, surely at least one of these officials should have known about the jurisdictional issue.
The Texas case and the DOJ-requested rule change show that a reasonable officer in the shoes of the law enforcement officials seeking the warrant should have known that there was a jurisdictional issue. To be clear, I'm not suggesting that the officials should have known that the magistrate did not have jurisdiction to issue the warrant. I'm suggesting that because of these circumstances, they should have known that the magistrate's jurisdiction to issue the warrant was in doubt-that there was a potential problem with jurisdiction. And if they knew that there would be an issue with jurisdiction, they had an obligation to flag it for the magistrate.[6]
B.
It is also clear that the officials seeking the warrant knew that the search would not be contained to the Eastern District of Virginia. The FBI's investigation revealed that Playpen had over 150,000 members and that the site received over 11,000 unique users every week. It would be absurd to believe that all of the users' computers would be in the Eastern District of Virginia. A reasonable official would have believed, correctly as it turns out, that the users' computers would be found in districts all over the country.[7]
*1298 Granted, the NIT technology is complex, and the uninitiated could be forgiven for not understanding exactly what is being searched and where that search would take place. But no one could credibly argue that the officials who developed the technology and who were responsible for deploying it were unclear about how it worked. The FBI knew the search was of computers, and that those computers could be anywhere.
III.
Having established that the officials seeking the warrant knew or should have known that there was a potentially fatal jurisdiction problem with the warrant, let's take a closer look at how they presented this issue to the magistrate.[8]
The caption to the warrant application states that the search will be of "computers that access" the Playpen website. Beneath the caption, the FBI agent seeking the warrant attests, under penalty of perjury, that he has "reason to believe" the property to be searched is "located in the Eastern District of Virginia."
The application directs the reader to "Attachment A" for a description of the property to be searched. Attachment A, titled "Place to be Searched," explains that the "warrant authorizes the use of a network investigative technique ('NIT') to be deployed on the computer server described below" to obtain certain information "from the activating computers described below." Below, it explains that the "computer server is the server operating" the Playpen website, "which will be located at a government facility in the Eastern District of Virginia." And it explains that the "activating computers are those of any user or administrator who logs into the [Playpen] by entering a username and password."
Thus, on the face of the warrant application, officials informed the magistrate that the search would be in the Eastern District of Virginia. The application then seemingly supported this assertion by noting that the server is in the district-the only geographic reference in the application.
True, an especially discerning magistrate might have gathered that the search is of computers, not of the server, so the location of the server is irrelevant, and the computer of "any user" could be outside the district. But the question is not whether it was possible for the magistrate to detect the error-the exclusionary rule is concerned with police misconduct, not magistrates' errors. See Leon , 468 U.S. at 916, 104 S.Ct. 3405. The question is whether the magistrate was misled, and whether law enforcement officials were responsible for the deception. See id. at 923, 104 S.Ct. 3405. Maybe the magistrate should have noticed. But the officials who sought the warrant understood the technology and how the search would work better than anyone, and if anyone should have noticed, it was they.
The affidavit supporting the warrant continues the charade. It mentions repeatedly that the server is located in the magistrate's district. Here are a few examples:
• "Accordingly, I request authority to use the NIT, which will be deployed *1299 on the TARGET WEBSITE, while the TARGET WEBSITE operates in the Eastern District of Virginia , to investigate any user or administrator who logs into the TARGET WEBSITE by entering a username and password."
• "Under the NIT authorized by this warrant, the TARGET WEBSITE, which will be located in Newington, Virginia, in the Eastern District of Virginia , would augment [the content sent to visitor's computers] with additional computer instructions. When a user's computer successfully downloads those instructions from the TARGET WEBSITE, located in the Eastern District of Virginia , the instructions, which comprise the NIT" will cause the user's computer to send certain information to the FBI.
• "During the up to thirty day period that the NIT is deployed on the TARGET WEBSITE, which will be located in the Eastern District of Virginia , each time that any user or administrator logs into the TARGET WEBSITE by entering a username and password, this application requests authority for the NIT authorized by this warrant to attempt to cause the user's computer to send the above-described information to a computer controlled by or known to the government that is located in the Eastern District of Virginia ."
The repeated emphasis of the server's location is especially suspicious given that the location of the server was completely irrelevant. The search was of users' computers, not of the server.
Why, then, did the affidavit repeatedly mention the server's location? It smacks of desperation, and it appears calculated to lull the magistrate into a false sense of jurisdictional security. I can think of no other reason to include so irrelevant a piece of information so many times.
In contrast, the affidavit is nearly silent on the decisive data point: the location of the computers. It is only on page 29 of 31 that the affidavit finally acknowledges (somewhat explicitly) that "the NIT warrant may cause an activating computer-wherever located-to send to a computer controlled by or known to the government" the information sought. This is the closest law enforcement comes to advising the magistrate that the search will occur outside the district. As a disclosure, it leaves much to be desired. The affidavit mentions this detail once, without any explanation of its impact. It does not say that, therefore, the search might occur outside the Eastern District of Virginia. It forces the magistrate to draw the conclusion. It is a breadcrumb, buried in a dense and complicated affidavit, left for the magistrate to follow.
In other warrant applications, law enforcement officials were not nearly so stingy with information about jurisdiction. For example, in the Texas case, the government confronted the jurisdiction problem and supplied the magistrate with an argument in the affidavit for why it thought there was jurisdiction. See In re Warrant , 958 F. Supp. 2d at 756. Courts should expect nothing less.
Even in the wiretap application-submitted simultaneously with the NIT application by the same Assistant U.S. Attorney-the application included a paragraph detailing the jurisdictional basis for the warrant, even though the jurisdiction for that order was straightforward and uneventful.[9] Here, in contrast, where there *1300 was a major problem with jurisdiction, any mention of jurisdiction is conspicuously absent. Why would the same attorney include a discussion of jurisdiction in one application, where it was less important, and omit any such discussion from another, where it was more important? It is hard to escape the conclusion that the officials seeking the warrant aimed to conceal the issue.
The comparison with these other examples illustrates why the officials in this case did not do what we "hope and expect" of law enforcement. Maj. Op. at ----. The disclosure in the affidavit was woefully inadequate.
The warrant's defenders argue that the disclosure on page 29 "cured" the warrant of any ambiguity. See, e.g. , McLamb , 880 F.3d at 690-91 ("To the extent the form is misleading, [the affidavit] cured any ambiguity by informing the magistrate judge that the NIT would cause activating computers 'wherever located' to transmit data to the FBI."). First of all, it's odd to say that the disclosure cured the warrant. The disclosure that the warrant authorized searches of computers "wherever located" is the fatal flaw; it's the reason the magistrate didn't have jurisdiction to approve the warrant. How could revealing the fatal flaw cure the warrant?
More accurately, the suggestion is that by eventually and indirectly revealing the warrant's defect, the officials seeking the warrant absolved themselves of any bad faith. In other words, law enforcement officials cannot be accused of bad faith so long as they technically, no matter how discreetly, disclose the truth somewhere in the warrant application. This sets too low a bar. It essentially gives officials permission to try to hoodwink magistrates: they can make false statements to the court so long as they include enough information to uncover their chicanery. If the magistrate fails to spot the issue, officials can cloak themselves in good faith reliance and execute the warrant without fear of suppression. I refuse to invite such gamesmanship. If law enforcement officials know of a problem with their warrant, they need to be forthcoming about it.
Here's the other problem with the "cure" argument: If the language in the application might have been enough to show the magistrate that the search would not be in the district, surely it was enough to reveal the same to the officials seeking the warrant. After all, wouldn't we expect the author to understand his writing better than the reader-especially when the subject concerns an exceedingly complex technology with which the author is familiar and the reader is not? And once the officials realize the problem, they need to address it, otherwise they are misleading the magistrate.
Furthermore, the argument that the application disclosed enough for the magistrate to discover the defect answers the wrong question. It focuses on whether the magistrate should have spotted the issue. Cf. United States v. Horton , 863 F.3d 1041, 1052 (8th Cir. 2017) ("Even if it were misleading to label the place to be searched as the Eastern District of Virginia, a reasonable reader would have understood that the search would extend beyond the boundaries of the district because of the thorough explanation provided in the attached affidavit.") (emphasis added), cert. denied , --- U.S. ----, 138 S. Ct. 1440, 200 L.Ed.2d 721 (2018). But, again, the exclusionary rule is concerned with curbing "police rather than judicial misconduct." Herring , 555 U.S. at 142, 129 S.Ct. 695. Thus, the proper question is, given *1301 what the officials knew or should have known, was it deliberately or recklessly misleading to present the application the way that they did. Put differently, did they consciously disregard a serious risk that the magistrate would think the search would occur in the Eastern District of Virginia? It's plain to me that they did.
If the officials knew that the search would be of computers outside the district, it was unacceptable to swear that the search would be within the district. If, perhaps, the officials had some other reasonable basis for believing that the search was still within the magistrate's jurisdiction, they needed to present it to the magistrate. It would be recklessly misleading to submit a warrant application to a magistrate repeatedly stating the search would be within the district, with one buried caveat, when the officials' only reason for stating that is some novel theory they declined to share with the magistrate.
Tellingly, at no point in this appeal, nor to our knowledge in any of the other appeals concerning the NIT warrant, has the government defended the warrant on the grounds that the search did in fact occur in the Eastern District of Virginia. How could they? Instead, the government has argued that the NIT search functioned like a tracking device that was installed within the district, and thus satisfied Federal Rule of Criminal Procedure 41(b)(4). A number of district courts have accepted this argument. See United States v. Workman , 863 F.3d 1313, 1321 n.5 (10th Cir. 2017) (listing cases), cert. denied , --- U.S. ----, 138 S. Ct. 1546, 200 L.Ed.2d 748 (2018). In light of these district court decisions, several of our sister circuits have said that they will not fault law enforcement for thinking there was jurisdiction when a number of federal judges have made the same mistake. See, e.g. , United States v. Moorehead , 912 F.3d 963, 970 (6th Cir. 2019) ("But reasonable jurists have come to different conclusions about whether the NIT Warrant was valid. We cannot, therefore, expect officers to have known that this type of warrant was invalid at the time it was sought.") (citations omitted), petition for cert. filed (U.S. May 20, 2019) (No. 19-5444).[10]
After the fact, courts can uphold a warrant on any basis. That same luxury should not extend to a good-faith analysis of the officials who sought the warrant. The FBI agent swore in the warrant application that he had "reason to believe" the property to be searched was in the Eastern District of Virginia. An official cannot make that representation if he does not actually have a reason, but is instead hoping for the magistrate to find one. Thus, the suggestion that because a few courts have upheld the warrant on a tracking-device theory it was reasonable for the officials seeking the warrant to believe there was jurisdiction, requires the assumption that the officials believed there was jurisdiction for the warrant on a tracking-device theory.
The problem with this logic is that law enforcement did not seek, nor did they obtain, a tracking-device warrant. See Maj. Op. at ----. To obtain a tracking-device warrant, law enforcement uses a different *1302 form from the one used for typical searches within the district. Compare Administrative Office of U.S. Courts, Criminal Form AO 102, Application for a Tracking Warrant (2009), with Criminal Form AO 106, Application for a Search Warrant (2010), https://www.uscourts.gov/forms/criminal-forms (last visited August 19, 2019).
A reasonable law enforcement official, especially an FBI agent with 19 years of experience, would understand the difference between a tracking-device warrant and a search warrant. A reasonable official would know that if the jurisdictional basis for the warrant was a tracking-device theory, he should seek a tracking-device warrant, or at least make the magistrate aware of the theory some other way. Bottom line: it is objectively unreasonable for law enforcement to believe there is jurisdiction on the basis of a warrant they did not seek and a theory they did not present.
* * *
To recap, the officials knew or should have known that there was a jurisdiction problem with the warrant. And they knew the search would not be within the district. If the search was of computers outside the district, the only possible basis for believing the magistrate had jurisdiction to issue the warrant would have been a tracking-device theory. But a reasonable official would know the warrant was not a tracking-device warrant, and it would be recklessly misleading to seek a regular search warrant based on a tracking-device theory without at least alerting the magistrate to the theory. As such, it appears to me that a reasonable official in these circumstances would have no basis for believing the magistrate had jurisdiction.
Even assuming the officials believed there was jurisdiction, the warrant application was misleading. The application states repeatedly that the search would be in the district, even though they knew the search would be of computers outside the district. They repeatedly emphasized the location of the server, which was irrelevant, and completely omitted any discussion of jurisdiction. The late disclosure that the computers could be "wherever located" did not eliminate the risk that the magistrate would be misled and did not give the officials license to make disingenuous representations elsewhere. For these reasons, I believe the officials deliberately or recklessly misled the magistrate.
IV.
Whether the exclusionary rule should apply is, ultimately, a question of whether the benefits of deterrence outweigh the costs of suppression. See Herring , 555 U.S. at 141, 129 S.Ct. 695. The costs-excluding reliable evidence and possibly allowing the guilty to go free-are high. Davis , 564 U.S. at 237, 131 S.Ct. 2419 ("[Exclusion] almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.") (citation omitted). But what about the other side of the scale? What are the benefits of deterrence in this case?
Other courts have given short shrift to the benefits of deterrence in this case. They claim there is minimal deterrent value because (1) the blame lies with the magistrate for approving the warrant, and (2) the NIT warrant would now be lawful after the rule change. See, e.g. , Moorehead , 912 F.3d at 970-71 ("The fact that any jurisdictional error here was made by the magistrate, coupled with the fact that Rule 41(b) has been amended to authorize warrants like the one at issue, means the benefits of deterrence cannot outweigh the costs.") (quotation omitted). This misses the point. If the officials who sought the *1303 warrant are culpable for misleading the magistrate, the fault lies with them. And the object of suppression would be to deter law enforcement from misleading magistrates in the future, not to prevent warrants like this one from issuing.
There is a reason the Supreme Court has said that if police conduct is deliberate, reckless, or grossly negligent, "the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Davis , 564 U.S. at 238, 131 S.Ct. 2419. If courts decline to invoke the exclusionary rule in the face of culpable misconduct, we condone and encourage it. We effectively establish a new standard for law enforcement. Thus, even though the NIT warrant would not be valid, this will not be the last time that law enforcement officials mislead a magistrate in their quest for a warrant of dubious validity.
With this case, ten courts of appeals have sanctioned the following standard: When law enforcement officials apply for a warrant, even if they know the warrant is constitutionally suspect, so long as they technically disclose the facts that would reveal the problem to a discerning magistrate, no matter how cursory or buried the disclosure, the warrant is effectively unimpeachable if the magistrate fails to detect the problem. I cannot believe that the law expects so little of law enforcement, or so much of magistrates.
This standard creates a warped incentive structure. It encourages law enforcement to obscure potential problems in a warrant application. Because officials can be less upfront about problems in a warrant application, the onus is on the magistrate to spot the issues. But it is well-established that if a magistrate makes a mistake-e.g., misses an issue, gets the law wrong-that mistake will almost always be forgiven because the police can generally rely on an approved warrant in good faith. See Leon , 468 U.S. at 922, 104 S.Ct. 3405. This is a system designed to encourage mistakes.
Instead, we should demand the utmost candor in warrant applications. Before today, I thought we did. The warrant process is premised on the good faith of law enforcement. See Franks v. Delaware , 438 U.S. 154, 164, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ("[T]he Warrant Clause ... surely takes the affiant's good faith as its premise ...."). It is "unthinkable" that a warrant application, "revealed after the fact to contain a deliberately or reckless false statement," would be beyond "impeachment." Id. at 165, 98 S.Ct. 2674. Indeed, if law enforcement officials were permitted to deliberately or recklessly include false representations in the warrant application, "and, having misled the magistrate, then [were] able to remain confident that the ploy was worthwhile," it would neuter the Fourth Amendment. Id. at 168, 98 S.Ct. 2674.
Similarly, candor underpins the rationale for the good faith exception. We extend good faith to police executing the warrant because they are entitled to presume that magistrates are competent. See Messerschmidt v. Millender , 565 U.S. 535, 547-48, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012). But there is no reason to defer to magistrates' judgments if law enforcement officials do not present the court with the full and accurate picture. See Leon , 468 U.S. at 914-15, 104 S.Ct. 3405 (stating that courts should not defer to a warrant when the magistrate's determination was based on a "knowing or reckless falsity" or when the magistrate was not presented with "[s]ufficient information").
It is especially important to demand candor in warrant applications. The warrant application process is ex parte , which increases the risk that false information will be accepted or problems will be overlooked.
*1304 See Franks , 438 U.S. at 169, 98 S.Ct. 2674 ("The usual reliance of our legal system on adversary proceedings itself should be an indication that an ex parte inquiry is likely to be less vigorous."). That risk, in turn, creates a temptation to withhold or obscure unfavorable information. See id. ("The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations.").
I also don't think candor is too much to ask for. When executing a warrant, police are making decisions in real time. Plus, typically, they are not lawyers, so we don't expect them to have as much knowledge of the law as a magistrate reviewing a warrant application from the comfort of her chambers. These considerations do not apply, at least not to the same extent, to officials seeking a warrant. Generally, these officials have just as much, if not more, time for reflection while preparing the application, as the magistrate does while reviewing it. And in the frequent cases where police work with prosecutors to prepare a warrant application, it is fair to expect them to have a greater knowledge of the law.
I'm not advocating to change the law-the law already requires candor in warrant applications. I'm asking courts to take this requirement seriously.
When the Supreme Court established the good faith exception, the principal dissent warned that it would "put a premium on police ignorance of the law." Leon , 468 U.S. at 955, 104 S.Ct. 3405 (Brennan, J., dissenting). Justice Brennan predicted that in close cases "police would have every reason to adopt a 'let's-wait-until-it's-decided' approach in situations in which there is a question about a warrant's validity or the basis for its issuance." Id. With this decision, his premonition has come true.
* * *
I recognize that my decision would have an unfortunate result. It would invalidate a warrant that led to the arrest and prosecution of hundreds who trafficked in child pornography. And it would suppress the evidence gathered under that warrant's authority, likely leading to the release of many of those offenders. But this unfortunate result is almost always the consequence when relevant, damning evidence is excluded. Such a result is the price we pay to protect the Fourth Amendment rights of the public. Therefore, we must follow the law even when faced with unpleasant outcomes. Otherwise, we excuse conduct, like the conduct at issue here, which invites strategic duplicity into the warrant process.
Because today's decision undermines the integrity of the warrant process-a process which plays a crucial role in protecting the rights guaranteed by our Constitution-I respectfully dissent.

I concur in all of the majority opinion except for part II.B.2.

The only reference to a search that potentially would occur outside the district comes buried on page 29 of the 31-page affidavit after repeated representations by the officers that the search would take place within the district. See infra part III.

The magistrate also found that the warrant did not satisfy any of the other territorial limits of Rule 41(b), though it does not appear that the FBI claimed to satisfy any provision other than Rule 41(b)(1). See id. at 756-58.

The Werdene court suggested that the Texas warrant is not analogous because it was "significantly more invasive" than the NIT warrant. Werdene , 883 F.3d at 218 n.12. The more invasive aspects of the Texas warrant are why the magistrate in that case found problems with the particularity requirement and the constitutional standards for video surveillance. See In re Warrant , 958 F. Supp. 2d at 758-61. Those aspects had nothing to do with the jurisdictional analysis. See id. at 756-58. The jurisdictional analysis applies equally here.

While the majority finds dubious the proposition that this knowledge could be imputed to "downstream line-level law enforcement officers" and finds no deterrent effect in holding such officers responsible for misleading magistrates regarding the jurisdictional defects in the warrant application, Maj. Op. at ---- n.14, I disagree. I find it hard to believe that Assistant U.S. Attorneys are not kept abreast of existing jurisdictional issues and the efforts their office is taking to solve those issues. I also find it hard to believe that the "downstream line-level" officers-who are doubtlessly experts in these technologies and techniques-were unaware of the misleading nature of their statements of fact here. They repeatedly suggested in the affidavit that a search would take place within a particular district when the true goal of the warrant was to search any relevant computers, regardless of their location. Therefore, contrary to the majority's assertion that this argument is "based entirely on speculation about what different government actors could have known," id. , I believe that the officers here should have known that they were acting improperly, which triggers the exclusionary rule. See Herring , 555 U.S. at 143, 129 S.Ct. 695. The burden should not rest on a magistrate to comb through a deceptively crafted and contradictory affidavit to detect the true nature of the warrant request.

The majority construes this argument to place "an affirmative obligation to 'flag' potential legal issues in their [warrant] application." Maj. Op. at ---- n.15. The majority disagrees with this approach, instead concluding that "[l]aw-enforcement officers have a duty to lay out facts-including jurisdictional facts-for reviewing courts, not to anticipate and articulate possible legal hurdles," and finding that the warrant application here "adequately-if imperfectly-lay[ed] out the facts." Id. However, the majority misunderstands the obligations I propose. I suggest merely that, when the officers and lawyers involved in presenting the affidavit have reason to believe that they are requesting a warrant that is improper, they not conceal precedent which is entitled to persuasive authority. Further, and more importantly, I disagree with the majority's characterization of the application here as "imperfect" but "adequate." The application had the tendency to deceive the magistrate by presenting repeated assertions of misleading facts, while burying the true goal at the back of the affidavit. I propose that law enforcement has the obligation, at minimum, to avoid such action.

The only connection to the Eastern District of Virginia was the server that hosted the site. But the server was originally in North Carolina; the FBI moved the server to Virginia. And the site's administrator lived in Florida. There truly was no reason to think the site had a special connection to the Eastern District of Virginia.

A party does not need to provide direct evidence that the false representation was made deliberately or recklessly; instead, the court can infer from the warrant application itself that a misrepresentation was deliberate or reckless if it would be clear to a reasonable official. Cf. Madiwale v. Savaiko , 117 F.3d 1321, 1326 (11th Cir. 1997) ("A party need not show by direct evidence that the affiant makes an omission recklessly. Rather, it is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself.") (quotation omitted).

Here is what the wiretap application said about jurisdiction: "This Court has territorial jurisdiction to issue the requested order under 18 U.S.C. § 2518(3) because the computer server intercepting all communications and on which the TARGET WEBSITE, including the TARGET FACILITIES, are located will be in Newington, VA, in the Eastern District of Virginia during the period of inspection."

Some of the courts making this point are actually responding to a different argument. In those cases, the argument was that the officers executing the warrant were not entitled to good faith, because the warrant was plainly invalid on its face. See, e.g. , United States v. Henderson , 906 F.3d 1109, 1119 (9th Cir. 2018) ("[O]ne is left to wonder how an executing agent ought to have known that the NIT warrant was void when several district courts have found the very same warrant to be valid.") (emphasis added), cert. denied , --- U.S. ----, 139 S. Ct. 2033, 204 L.Ed.2d 232 (2019). I agree with these courts that it was objectively reasonable for the executing officers to rely on the warrant and to defer to the magistrate's judgment that there was jurisdiction to issue the warrant.