NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0104n.06

Nos. 19-2151/2153

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ADAM CHRISTOPHER COLLARD (19-2151); | ) | COURT FOR THE WESTERN |
| JOSEPH ALAN COLLARD (19-2153), | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |

**FILED**
Feb 25, 2021
DEBORAH S. HUNT, Clerk

BEFORE: BATCHELDER, MOORE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. Defendants Adam and Joseph Collard appeal their convictions for various charges related to possession of child pornography and challenge their prison sentences. Most of defendants' claims are meritless, but defendants raise colorable challenges based on the district court's admission of Adam's prior conviction and evidence that Joseph possessed a sex toy. Any error in the admission of this evidence was harmless error, however.

Defendants were indicted in 2018 on various child pornography-related charges stemming from an FBI investigation based in the Eastern District of Virginia. In February and March of 2015, the FBI had been investigating Playpen, a child-pornography sharing website on the dark web. To access Playpen, users must download and use The Onion Router (Tor) browsing software, which masks users' IP addresses by routing users' signals through computers worldwide. While law enforcement can generally review user logs to identify a website's users, because Playpen users "mask" their IP addresses, such logs would show the IP address of the most recent computer the user was routed through, not the originating IP address. To track down the true IP addresses

of Playpen users, the FBI sought and obtained authorization to use a network investigative technique ("NIT") from a federal magistrate judge in Virginia.[1]  The NIT allowed the FBI to learn the actual IP addresses of the website's users, which in turn enabled law enforcement to identify computers and their locations.

During the investigation, the FBI traced a user's log-on name and IP address to defendant Adam Collard and learned his home address.  The FBI determined that Adam lived with his parents and brother in Eaton Rapids, Michigan, and discovered that Adam was a registered sex offender, who had previously been convicted for possession of child pornography.  Law enforcement then obtained two search warrants:  one for Adam's home, and another for a camper and vehicle at a campground that Adam was staying at.  Both search warrants were executed on the same day.  At the campsite, law enforcement seized a laptop, smart phone, external hard drive, thumb drives, and a flash drive.  During the residential search, Adam's father Douglas was present and informed agents that Adam and his brother Joseph had separate rooms.  The agents searched both rooms, each with its own computers and storage media, which were ultimately seized.  Investigators conducted a forensic examination of the devices and concluded that both Adam's and Joseph's computers contained child pornography and a file-sharing program.  Adam's devices had tens of thousands of images of child pornography (including images depicting bestiality, bondage, and torture), more than one thousand pornography movies, and a "Pedophile Sex Manual."  Most of the content on Adam's devices involved female minors.  Joseph's computers and storage media contained hundreds of images and more than seventy videos containing sex acts or male masturbation; Joseph's child pornography collection primarily involved male minors.

---

[1] The FBI learned of Playpen's true IP address from a foreign law enforcement agency and executed a search warrant at the hosting company.  The FBI seized the computer server and covertly operated the site from Virginia.

Adam and Joseph were tried together and were represented by the same privately retained counsel. Each defendant consented to the joint representation, and the district court found there was no actual or potential conflict of interest. At trial, the Government relied on the testimony of an FBI agent and a computer forensics expert to elicit evidence that the brothers were in the computer repair business and were sophisticated computer users. The Government also introduced evidence against Adam of Adam's prior conviction for possession of child pornography. In addition, the Government introduced against Joseph evidence that Joseph purchased and possessed an anal dildo, which the Government submitted for the purpose of linking Joseph to a computer seized from his room that contained a record of the purchase and child pornography. Adam was convicted of two counts of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1), and one count of possession of child pornography, in violation of § 2252A(a)(5)(B) and (b)(2). His brother Joseph was convicted of one count of attempted receipt of child pornography and one count of receipt of child pornography, both in violation of § 2252(a)(2)(A) and (b)(1), and one count of possession of child pornography in violation of § 2252A(a)(5)(B) and (b)(2).

Adam and Joseph timely appealed. They first argue that the district court improperly denied their motion to suppress evidence seized under the NIT, which they argue was an illegal warrant. They further contend that the district court erred by denying their motion to compel the Government to produce certain information related to NIT technology used to track Adam's online activity. Adam and Joseph both challenge the admission of Adam's prior conviction for possession of child pornography, and Joseph challenges the admission of evidence that he possessed a sex toy. Finally, they appeal their sentences, arguing that the district court incorrectly found that they engaged in distribution or trafficking of child pornography.

**NIT Warrant**

Defendants' first claim, that the computers and digital property seized by the Government should have been suppressed, was properly denied by the district court. Defendants argue that the initial NIT warrant in the Eastern District of Virginia was not sufficiently particularized and thus violated the Fourth Amendment. According to defendants, evidence seized pursuant to the second warrant (which authorized the search and seizure of the Collard home and camper) were fruits of the poisonous tree and should have been suppressed. This court has already heard and rejected a similar challenge to the NIT warrant's particularity in *United States v. Harney*, 934 F.3d 502, 505–06 (6th Cir. 2019), another case that stemmed from the investigation in Virginia. That decision is controlling here.

Without addressing *Harney*, defendants maintain the warrant was not sufficiently particularized, pointing to recent testimony (in a separate case) that the FBI was able to "monitor[]" and "capture[] the activity associated with each individual user on the Playpen Web site." Given these capabilities, defendants argue, the FBI could have obtained individual NIT warrants against specific users who had accessed child pornography. Such a "targeted approach" would have excluded from the Government's search those users "who simply logged into the site—even if [they] logged out immediately without viewing any child pornography." This argument ignores the "reality of web-based searches" and is not persuasive. *Id.* at 505.

Defendants' arguments about the breadth of the warrant appear to be animated by concerns that it would sweep up innocent bystanders seeking access to Playpen's legal content. But as we have previously explained, the notion that innocent users would be on Playpen (and thus subject to government monitoring) is hardly plausible. *See United States v. Tagg*, 886 F.3d 579 (6th Cir. 2018); *United States v. Bateman*, 945 F.3d 997 (6th Cir. 2019). Websites on the dark web cannot

be accessed by just anyone on the Internet or through a typical search browser. *Tagg*, 886 F.3d at 583. Rather, users must use Tor to get on those sites, which typically consist of a randomized URL containing a 16-digit string of numbers and letters, such as upf45jv3bziuctml.onion. *See id.* Such a URL ensures that "[a]bsent some statistically impossible stroke of luck," an Internet user cannot accidentally happen upon the site.[2] *Tagg*, 886 F.3d at 583. On the off chance that Internet users accidentally came across Playpen's homepage in particular, they would then encounter suggestive images involving prepubescent girls, alerting them to the website's content. *Bateman*, 945 F.3d at 1002 & n.9. We have held that because of the numerous affirmative steps Playpen users had to take to access the site, there was probable cause to conclude that those who did so acted knowingly and with the intention to view child pornography, itself a criminal act. *Tagg*, 886 F.3d at 587. The NIT warrant is thus "[f]ar from the kind of general warrant at which the particularity requirement takes aim." *Harney*, 934 F.3d at 505.

Our holding that the NIT warrant was constitutional did not rest on whether the FBI was technologically capable of employing a narrower approach. In fact, while the court in *Harney* understood the warrant to permit searches of any computers that logged on to Playpen, *id.*, the record here reflects that the NIT was deployed more narrowly. The NIT was "only used against users accessing *certain portions* of the site (e.g. the preteen hardcore photos/videos section, as opposed to general discussion boards)," further ameliorating concerns about the breadth of the warrant. (Emphasis added). New evidence that the FBI could have narrowed its search, without more, does not take this case outside of the scope of previous rulings; nor does it render the NIT warrant constitutionally infirm.

---

[2] Because of a misconfiguration that does not appear to be at issue here, before February 20, 2015, Playpen was "occasionally accessible through the traditional Internet." A user would have still needed to know the IP address of the server that hosted Playpen, information which was not publicly available.

Defendants' argument that the NIT warrant exceeded the territorial limits in Federal Rule of Criminal Procedure 41 is also unavailing because the good-faith exception applies. We have previously assumed that the NIT warrant may have exceeded the scope of Rule 41, s*ee, e.g.*, *United States v. Moorehead*, 912 F.3d 963, 969 (6th Cir. 2019); *Harney*, 934 F.3d at 506. But because "reasonable jurists have come to different conclusions about whether the NIT Warrant was valid" under Rule 41(b)'s territorial limits, we have concluded that we cannot "expect officers to have known that this type of warrant was invalid at the time it was sought" and have thus applied the good-faith exception. *Moorehead*, 912 F.3d at 970 (citing cases). Defendants have not pointed to anything that should compel the court to reach a different result here. Instead, without addressing any of the Sixth Circuit opinions on point, they cite only district court decisions that predate the relevant precedent, such as *United States v. Martin*, No 15-20544-02, 2016 WL 4493675 (E.D. Mich. 2016).

To the extent that defendants rely on new evidence about the FBI's capabilities to argue that the good-faith exception should not apply, such a claim also fails. Although defendants do not clearly spell out their argument, it appears they contend that, because the NIT warrant violated the particularity requirement, and because FBI officers knew they could have narrowed their search, the good-faith exception should not apply. As discussed above, defendants have not shown that the warrant violated the Fourth Amendment, which should end the matter. Defendants also have not shown how a search that would have narrowed the number of users being surveilled affects the question of whether the magistrate judge exceeded any territorial limits. The exclusionary rule should not apply where, as here, "an objectively reasonable officer could have believed the seizure valid." *United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2006). There is no evidence here that the officers had any reason to believe that the seizure was invalid, even if

they knew the FBI could have used a narrower approach. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Here, however, defendants do not allege any such misconduct. They never argue that the FBI misrepresented its technological abilities to the magistrate judge or point to any police misconduct, much less any conduct that is "deliberate, reckless, or grossly negligent." The evidence was also seized pursuant to a second warrant, thus weakening the link between the evidence and any misconduct related to the NIT warrant. To be sure, the second warrant was born out of the first, but courts should be wary of applying the exclusionary rule where the connection between alleged police misconduct and relevant evidence becomes "sufficiently attenuated" so as to "dissipate[e] . . . the taint," and where, as here, the "flagrancy of the police misconduct" is hardly an issue. *United States v. Leon*, 468 U.S. 897, 911 (1984) (citations omitted).

## NIT Source Code

Defendants' second claim, that the district court should have compelled the Government to disclose the "complete source code for the [NIT], including the exploit and payload" under Federal Rule of Criminal Procedure 16(a)(1)(E), also fails[3]. This court heard a similar claim in *Harney* as well, and concluded that the district court did not abuse its discretion by declining to require the government to hand over the NIT. Defendants' contention in this case that the NIT source code is necessary to determine whether a third party hacked their computers and placed the pornography on their devices mirrors Harney's arguments that the government improperly stored

---

[3] Although Joseph raises this argument, it is not clear that he has standing to do so or how he would benefit from the NIT source code. Law enforcement did not rely on the NIT to identify Joseph; his computer was seized once law enforcement had used the NIT to identify Adam.

data or made his computer susceptible to third-party access. *Harney*, 934 F.3d at 508. While we were sympathetic to Harney's concerns, we reasoned that his arguments were too generalized to "show[] a problem . . . that overrides the government's interest in keeping the generic components of the technique secret." *Id.* The same is true here. Defendants again do not address *Harney*, much less distinguish it. To be sure, the record here reflects that—unlike in *Harney*—defendants' experts *did* use the Government's tools that were turned over to the defense, and their defense at trial hinged on the possibility that third parties maliciously accessed their computers and downloaded the content. But defendants offer only a cursory argument that they should not be required to show third-party wrongdoing before obtaining the very tools enabling them to show such wrongdoing. Such a conclusory argument, however, is insufficient to render *Harney* inapplicable. *See id.*

### Adam's Prior Conviction

Defendants make a colorable argument that the district court erred in admitting Adam's prior conviction for possession of child pornography. Any such error, however, is harmless.

Before trial, Adam filed a motion in limine seeking to exclude evidence of his previous conviction for possession of child pornography under Federal Rule of Evidence 404(b). The district court granted his motion, "subject to renewal of a request by the Government based on the proofs offered at trial." During the trial, defense counsel cross-examined an FBI computer forensic examiner, and suggested that the child pornography found on Adam's computer may have been due to malware or was downloaded by one of Adam's employees who had access to his computer. In response to this line of questioning, the Government argued that the defense had "put[] knowledge squarely at issue," and renewed its request to admit Adam's prior conviction. The court agreed and admitted the evidence over defendants' objections. Through the testimony of

FBI Agent Rodney Charles, the jury learned only that the conviction was for possession of child sexually explicit material; the judgment of sentence was admitted as an exhibit, and the Government offered no evidence about the circumstances involving the conviction. The district court issued limiting instructions twice: once immediately after Charles was done testifying, and again when it gave the jury final instructions before deliberation. The court instructed the jury that the conviction could not be used against Joseph and could be used against Adam only as it "relates to his knowledge, identity, or absence of mistake."

Adam and Joseph maintain that despite the limiting instructions, the evidence should have been excluded under Federal Rule of Evidence 404(b), which prohibits the use of prior offenses to "prove a person's character in order to show that on a particular occasion, the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence may be admissible, however, for other purposes, including—as the district court found relevant here—proving knowledge, absence of mistake, or identity.[4] *See* Fed. R. Evid. 404(b)(2). Under Rule 404(b),

> the district court must: (1) make a preliminary finding as to whether sufficient evidence exists that the prior act occurred; (2) determine whether the other act is admissible for one of the proper purposes outlined in Rule 404(b); and (3) apply Rule 403 balancing to determine whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice or the other concerns embodied in Rule 403.

*United States v. Allen*, 619 F.3d 518, 523 (6th Cir. 2010).[5] Defendants do not meaningfully challenge the first prong.

---

[4] At argument, the Government conceded that the only permissible purposes were knowledge, identity, and absence of mistake. We therefore confine our analysis to those purposes.

[5] Evidentiary rulings are generally subject to an abuse of discretion standard, but this court has previously applied a three-tier test that aligns with Rule 404's three-part test and in which the court reviews:

> (1) for clear error the district court's determination that the "other act" took place;
> (2) de novo the district court's legal determination that the evidence was admissible for a proper purpose; and (3) for abuse of discretion the district court's

As to the second prong, the district court colorably erred when it concluded that Adam's prior conviction is admissible for knowledge or absence of mistake where there was no evidence that the previous offense involved the use of computers or similar technology. The Government offered no evidence that Adam obtained the previous pornographic materials electronically, and the court did not probe further into the circumstances of the previous offense. In fact, defense counsel later introduced evidence that the prior conviction involved ten photographs that he possessed in his parents' basement.

It is also questionable that the prior conviction was admissible to show identity. Where identity is in dispute, evidence "that the defendant previously committed a different crime using the same or similar modus operandi as was employed in the commission of the crime charged [is admissible] to show that the same actor committed both crimes." *United States v. Fountain*, 2 F.3d 656, 668 (6th Cir. 1993), *overruled on other grounds*, *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 717 (6th Cir.1999). The Government here made no showing that the previous conviction involved similar circumstances—let alone a nearly identical method of operations.

Even assuming that the previous child pornography conviction served a proper purpose under Rule 404, there is a colorable argument that under Rule 403, the probative value of the prior conviction "is substantially outweighed by a danger of . . . unfair prejudice." Here, the Government conceded, it presented ample evidence of attribution, and the prior conviction was substantially similar to one of the charges for which he was indicted.

---

determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect.

*United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008). There appears to be an unresolved dispute as to which standards apply, while some panels consider the different formulations to be consistent. We need not resolve this disagreement in this case.

Ultimately, however, admission of Adam's prior crime was harmless. The record reflects that the Collard brothers ran a computer repair business and were sophisticated computer users. The Government showed the file paths for the downloaded content, which contained Adam's and Joseph's names. That Joseph had downloaded encrypted files the Government could not break further shows his technological prowess. The Government also presented evidence refuting defense counsel's suggestion that the child pornography could have unwittingly been on his computer through malware. Through the testimony of the FBI computer forensic examiner, the jury learned it was unlikely for someone—especially someone with Adam's computer repair expertise—to be unaware of the existence of thousands of child pornography images on a device. The Government further elicited testimony that there was no evidence of malware or ransomware on the seized devices (and that malware and ransomware could not create CDs with child pornography). In addition, evidence "that child pornography was downloaded at all hours of the day and night . . . [and] not necessarily within business hours," severely undercuts Adam's argument that an employee downloaded the content.

As to Joseph, he was clearly not harmed by the admission of his brother's conviction. Joseph points to the fact that that the Government painted him and his brother as "sexual deviants" and that he was tainted by his association with Adam. Immediately after the jury heard evidence of Adam's conviction, the district court specifically instructed the jury that it "can consider the evidence only as relates to [Adam's] knowledge, identity, or absence of mistake," but that it "must not consider it for any other purpose as to [Adam]" and that it "may not consider it for any purpose as to his co-defendant." At the trial's closing, the court again told the jury that it "cannot consider [Adam's previous conviction] in any way against the other defendant, Joseph Collard." We presume that jurors follow instructions, *see United States v. Harvey*, 653 F.3d 388, 396

(6th Cir. 2011), and the presumption is particularly strong with respect to that instruction. The jury was told unequivocally that the prior conviction could not be used as to Joseph. Even the out-of-circuit case which Joseph cites for the proposition that a jury may draw adverse inferences based on defendants' associations recognized that such a risk is generally "too insubstantial in most circumstances to survive forceful instructions." *United States v. Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980).

At bottom, there was compelling proof linking both defendants to the child pornography on their computers and electronic devices and ample evidence dispelling defendants' argument that they did not download or were unaware of the content on their computers. Defendants have offered no persuasive argument to the contrary.

### Admission of Joseph's Possession of a Sex Toy

Joseph mounts a separate challenge to the admission of evidence that he possessed a dildo, which also fails. During the trial, the Government elicited testimony from an FBI agent that he found an anal dildo in Joseph's room. The Government introduced as an exhibit a screenshot of the Amazon order confirmation for the dildo, the purpose of which was to link Joseph as the owner of a seized computer that contained pornography. Defense counsel objected and later requested a mistrial, and the judge denied defense counsel's requests both times. On appeal, Joseph argues the district court erred by admitting the evidence, which he asserts was of limited probative value and substantially outweighed by its prejudicial impact.

Although the dildo evidence is indeed prejudicial, the district court likely did not abuse its discretion when it ruled the evidence admissible, and in any event, the admission would be harmless error. A district court abuses its discretion when it "relies on clearly erroneous findings of fact, improperly applies the law or uses an erroneous legal standard." *United States v. Dixon*,

413 F.3d 540, 544 (6th Cir. 2005) (citing *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir.1995)). The district court found that the evidence connected to the dildo purchase was relevant to the question of computer ownership. While acknowledging the evidence's prejudicial nature, the district court concluded that because the Government was introducing the evidence in the form of "just a piece of a paper," it was "not *unfairly* prejudicial." (Emphasis added). This was particularly true given the other admissible evidence in the case, which included images and screen shots of the child pornography. Joseph is correct that there may have been other less prejudicial evidence to tie him to the computer and the room in which it was seized. The Government admits as much, arguably making the dildo-related evidence cumulative. The Government further clarified at argument, however, that it chose to introduce this evidence in particular because it is deeply personal and Joseph would have been unlikely to lend his computer to others if he was using it for such personal purchases. While the alternative means of less prejudicial proof arguably weakens the district court's reasoning, it does not give rise to a "definite and firm conviction" that there was a "clear error of judgment," which is the standard stated in cases such as *United States v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002). In any event, even if the admission of the dildo evidence was error, the ample other evidence allowing the jury to attribute the computer to Joseph makes the error harmless.

### Sentencing Challenges

Finally, defendants' claims that the district court miscalculated their sentences are also without merit. Adam and Joseph both challenge the two-level enhancement under U.S.S.G. § 2G2.2(b)(3)(F), which applies only if "the defendant knowingly engaged in distribution" in certain circumstances. Their argument appears to be that because they were not charged with trafficking or distribution, and because the Government did not establish to the jury

that they intended to traffic in or knowingly distributed pornography, the court erred in applying the enhancement. Their appeal is essentially a challenge to judicial fact-finding in sentencing more generally, although they recognize this practice is permissible.[6] Because defendants used file-sharing software, under this circuit's precedent, the district court's findings were not erroneous.

A two-level enhancement for distribution may be applied to a defendant's sentence when the defendant has used file-sharing software. *See, e.g.*, *United States v. Abbring*, 788 F.3d 565, 567 (6th Cir. 2015) (citing cases). This court has upheld the application of the enhancement and has done so even where the defendant was convicted or pleaded guilty only for crimes of possession, receipt, or attempted receipt and not for distribution. *See id.*; *see also United States v. Dunning*, 857 F.3d 342, 346 349–50 (6th Cir. 2017). This is because the use of a file-sharing program is directly related to the sharing and transferring of files, which in turn "equals distribution." *Dunning*, 857 F.3d at 350 (citing *Abbring*, 788 F.3d at 567). To be sure, previous cases like *Abbring* involved a different file-sharing program and a defendant who conceded he understood how the peer-to-peer software worked, which defendants here have not done. *Dunning*, however, took *Abbring* further, and reinforced the conclusion that the "knowing use of peer-to-peer software justifies the distribution enhancement" where the defendant has not presented evidence that he was ignorant of the software's sharing function. *Id.*

---

[6] Defendants quote a Congressional Research Services article that identifies various Supreme Court justices who have expressed that sentencing enhancements based on judicial fact-finding of uncharged conduct may pose constitutional issues. But beyond extensively quoting the argument and offering the speculative assertion that the Supreme Court may be inclined to visit this issue, defendants do not present any arguments in support of the proposition that judicial fact-finding is a violation of their Sixth Amendment rights.

Adam and Joseph make no mention of these cases but instead center their argument on the specific features of Frostwire, presumably in an attempt to show they were ignorant of the program's file-sharing features. Defendants refer to a 2011 settlement between the Federal Trade Commission (FTC) and Frostwire related to Frostwire's deceptive practices.[7] According to the FTC, Frostwire may have misled users about the software's file-sharing capabilities, which resulted in users' inadvertently sharing personal files.

Even if Frostwire's deceptive practices were enough to nudge these cases outside *Abbring*'s and *Dunning*'s scope, it is not apparent whether and to what extent Adam or Joseph were impacted by those practices. Although some versions of the desktop program downloaded before June 10, 2011, defaulted to automatic file-sharing and misled users "into believing that files they downloaded . . . would not be shared," Defendants do not establish they had the affected versions. Even if defendants had downloaded those versions, it is unlikely that such tech-savvy users would have been easily deceived or unaware that their computers were sharing files. They offer only a conclusory assertion that "a user of [their] laptops would have been misled by [the] software which allowed unintended file-sharing," an argument that the district court found to strain credulity considering defendants' ability to access the dark web and Frostwire through a Tor. Furthermore, because Adam accessed Playpen in 2014-2015—presumably after Frostwire

---

[7] The FTC issued a press release announcing the settlement, which was based on

> charges that [Frostwire's] software likely would cause consumers to unwittingly expose sensitive personal files stored on their mobile devices, and that it misled consumers about which downloaded files from their desktop and laptop computers would be shared with a file-sharing network. The settlement bars Frostwire from using default settings that share consumers' files, requires it to provide free upgrades to correct the unintended sharing, and bars misrepresentations about what files its applications will share.

Press Release, Federal Trade Commission, Peer-to-Peer File-Sharing Software Developer Settles FTC Charges (Oct. 11, 2011), https://www.ftc.gov/news-events/press-releases/2011/10/peer-peer-file-sharing-software-developer-settles-ftc-charges.

upgraded the software and changed its default settings—Adam's arguments that he was unaware of file-sharing become more implausible.

Adam separately challenges the district court's denial of a reduction under U.S.S.G. § 2G2.2b(1), which provides for a two-level reduction if "the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor[] and . . . the defendant did not intend to traffic in, or distribute, such material." We have previously held that "a defendant whose sentence is enhanced under § 2G2.2(b)(3) for distribution is not entitled to a reduction under § 2G2.2(b)(1)." *Shepard*, 661 F. App'x at 351 (citing *Abbring*, 788 F.3d at 567–68). The district court therefore properly denied Adam's request for a reduction.

Joseph also objects to a two-level enhancement under § 2G2.2(b)(6), which applies "[i]f the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material." But Joseph asserts only that had the district court sustained his objection, his offense level would have been reduced. He fails to explain how the district court erred in determining that the conduct involved the use of computers, a remarkable assertion given the computers and electronic devices attributed to him.

For the foregoing reasons, the convictions and sentences of Adam and Joseph Collard are affirmed.