NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0221n.06

No. 24-1276

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| NOPPHADON NINSAWAT, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: THAPAR, BUSH, and LARSEN, Circuit Judges.

**BUSH, Circuit Judge.** A jury convicted Defendant-Appellant Nopphadon Ninsawat on several felony counts surrounding his online sexual relationship with a fifteen-year-old girl and receipt of child pornography. On appeal, Ninsawat raises several challenges to his convictions and sentence. We reject his arguments and **AFFIRM.**

**I.**

**A.**

In the summer of 2022, the mother of the fifteen-year-old victim went to the local police station to report events that are any parent's nightmare. The mother had recently uncovered that her daughter (whom we will call MV-1) had developed an online sexual relationship with Ninsawat, a thirty-one-year-old man.

The relationship had begun over Snapchat, a social media platform that allows users to exchange messages, pictures, and videos, all of which are typically set to disappear after the

recipient views the message. MV-1 would later testify that she began communicating with Ninsawat because she "was very alone" and "just wanted a friend or someone [she] could talk to, and he," Ninsawat, "knew that" and "took advantage of that." Trial Tr. Vol. III, R. 109, PageID 1023. Eventually, MV-1 and Ninsawat began exchanging sexually explicit messages and images. Ninsawat would later admit to receiving and saving at least 48 images of MV-1 engaging in sexually explicit conduct—images that he would often later view to gratify himself sexually.

Sometime thereafter, MV-1's mother examined MV-1's cellphone and uncovered some of the messages that the two had exchanged. Understandably horrified, she called Ninsawat, told him MV-1 was fifteen, and instructed him not to contact MV-1. Although MV-1's mother then took her daughter's phone, the girl found an old phone and once again began exchanging messages with Ninsawat, this time through the social media platform Instagram.

The Instagram communications were, to say the least, graphic. Ninsawat repeatedly sent MV-1 images and videos of his genitals, often when he was masturbating (sometimes to old images of MV-1). He frequently described in graphic detail the sexual acts he wished to perform on the fifteen-year-old. Her young age, he would tell MV-1, did not matter to him. *See, e.g.*, Affidavit, R. 43, PageID 191. And on several occasions, he asked MV-1 to engage in sexually explicit conduct, record it via picture or video, and then send the recording to him through Instagram's "Vanish Mode" feature. That feature allows a user to send an image, video, or message that, once viewed by the recipient, disappears or becomes unavailable to be viewed again.

On some occasions, MV-1 resisted these requests. She told Ninsawat that she didn't "wanna send those explicit photos anymore," that she couldn't send them because she was still 15, and that she didn't "feel comfortable" with his requests because "it's basically . . . child porn." Affidavit, R. 43, PageID 188–89, 192. She also expressed discomfort with Ninsawat saving

explicit photos she previously sent via Snapchat. Other times, however, she fulfilled Ninsawat's requests, engaged in the sexual conduct he requested, and sent him visual depictions of her doing so.

Eventually, MV-1's mother uncovered the old phone and the Instagram messages. When federal agents reviewed subpoenaed records of those conversations, they sought and received a warrant from a federal magistrate authorizing agents to search Ninsawat's residence and seize electronic devices that might contain evidence of Ninsawat's online interactions with MV-1.

**B.**

The United States indicted Ninsawat on eight felony counts surrounding his Instagram communications with MV-1. Counts one through three involved communications that occurred on or about June 8, 2022, and charged Ninsawat with sexual exploitation of a child in violation of 18 U.S.C. §§ 2251(a) and (e), coercion and enticement in violation of 18 U.S.C. § 2422(b), and receipt of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1). Counts four and five involved communications that occurred on or about June 9, 2022, and charged Ninsawat with attempted sexual exploitation of a child and attempted coercion and enticement. Finally, counts six through eight involved communications that occurred on or about June 20, 2022, and likewise charged Ninsawat with sexual exploitation of a child, coercion and enticement, and receipt of child pornography.

Before trial, Ninsawat moved, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), for a hearing to challenge the sufficiency of the affidavit supporting the warrant issued to search his home and seize electronic devices found therein. Ninsawat also moved to dismiss the Indictment, arguing Congress exceeded its authority under the Commerce Clause in criminalizing his conduct. The district court denied both motions, and the parties proceeded to trial.

After a four-day trial, the jury convicted Ninsawat on all eight counts. Ultimately, the court sentenced Ninsawat to a total term of 180 months' imprisonment, which was the mandatory minimum sentence for counts one, four, and six. *See* 18 U.S.C. § 2251(e). Ninsawat timely appealed.

## II.

Ninsawat raises four challenges to his convictions and sentence. First, he claims that his conduct lacked a sufficient connection to interstate commerce to be the proper subject of the federal criminal law. Second, he challenges the district court's denial of his motion for a *Franks* hearing. Third, he maintains the prosecution failed to introduce sufficient evidence for a reasonable juror to find him guilty of violating § 2251(a) and § 2422(b). Finally, he argues his sentence violates the Eighth Amendment's prohibition on the infliction of cruel and unusual punishments. We address each argument in turn. Ultimately, none avails.

## A.

We begin with Ninsawat's argument that his conduct lacked a sufficient connection to interstate commerce. We interpret his briefs to raise two arguments: 1) that the United States produced insufficient evidence to establish the statutory interstate commerce elements, and 2) that Congress exceeded its authority under the Commerce Clause in criminalizing his conduct. Neither persuades.

## 1.

*First*, the United States introduced sufficient evidence for a reasonable juror to conclude that Ninsawat's conduct satisfied the relevant statutory interstate commerce elements. We review the sufficiency of the prosecution's proof de novo, *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010), and ask whether any rational trier of fact could have found the elements of the

offenses charged beyond a reasonable doubt, *Jackson v. Virginia*, 443 U.S. 307, 313–20 (1979). In answering that question, we view the evidence in the light most favorable to the United States and give it the benefit of all reasonable inferences. *United States v. Fekete*, 535 F.3d 471, 476 (6th Cir. 2008).

For each count, the United States was statutorily required to prove some element related to interstate commerce. The United States introduced sufficient evidence for each count.

The interstate nexus for each count is fulfilled, at the very least, when the government proves the offense involved the use of a "means" or "facility" of interstate commerce. *See, e.g.*, § 2251(a) (depictions were "transported or transmitted using any means or facility of interstate . . . commerce"); § 2422(b) (persuades, induces, entices, or coerces "using . . . any facility or means of interstate . . . commerce"); § 2252A(a)(2)(B) (receives material that contains child pornography "using any means or facility of interstate . . . commerce"). In the context of child pornography and exploitation statutes, we have repeatedly held that the internet is a "means" or "facility" of interstate commerce. *See, e.g.*, *United States v. Clark*, 24 F.4th 565, 573 (6th Cir. 2022); *United States v. Napier*, 787 F.3d 333, 346–47 (6th Cir. 2015). We typically presume that identical statutory phrases bear the same meaning throughout related legal texts. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 172 (2012) ("The presumption of consistent usage applies also when different sections of an act or code are at issue."). Because we see no contextual clue suggesting Congress meant something different by "means or facility of interstate commerce" here, *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 319–20 (2014), the internet is likewise a means or facility of interstate commerce for purposes of Ninsawat's statutes of conviction. So, by introducing evidence that Ninsawat committed his offenses using internet-based applications like

Instagram and Snapchat, the United States introduced sufficient evidence from which a reasonable juror could conclude it established the interstate commerce elements. *See Clark*, 24 F.4th at 574; *United States v. Zupnik*, 989 F.3d 649, 653–54 (8th Cir. 2021).

**2.**

*Second*, under existing precedent, Congress did not exceed its authority under the Commerce Clause in criminalizing Ninsawat's conduct.[1] As relevant here, that Clause grants Congress the power "to regulate commerce . . . among the several States." U.S. Const. art. 1, § 8, cl. 3. The Necessary and Proper Clause, in turn, grants Congress "every power needed to make that regulation effective." *Gonzales v. Raich*, 545 U.S. 1, 36 (2005) (Scalia, J., concurring in the judgment) (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118–19 (1942)); *see also* U.S. Const. art. I, § 8, cl. 18.

Two principles from existing Commerce Clause precedent demonstrate that criminalizing Ninsawat's conduct falls within Congress's legislative power. First, the Clause gives Congress the power to regulate the "use of the channels" through which "interstate commerce" occurs. *United States v. Lopez*, 514 U.S. 549, 558 (1995). Second, it permits Congress to regulate the "instrumentalities of interstate commerce," even when a party uses those instrumentalities only for intrastate activities. *See United States v. Allen*, 86 F.4th 295, 299–302 (6th Cir. 2023) (per curiam) (holding that "[b]ecause phones are 'instrumentalities of interstate commerce,' Congress may even regulate their 'intrastate' use"). We have characterized the internet as either a channel or an instrumentality of interstate commerce. *See, e.g.*, *United States v. Chambers*, 441 F.3d 438, 449–50 (6th Cir. 2006); *United States v. Person*, 714 F. App'x 547, 551 (6th Cir. 2017); *see also United*

---

[1] Because Ninsawat's argument turns on conclusions of law, we review de novo the district court's holding that criminalizing Ninsawat's conduct falls within Congress's legislative power. *See United States v. Bowers*, 594 F.3d 522, 527 (6th Cir. 2010).

*States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006) (holding that the internet is "both an instrumentality and channel of interstate commerce" (quotation omitted)). It was, therefore, within Congress's power to criminalize Ninsawat's conduct on the internet, regardless of whether he was using the internet to communicate with another person physically present in Michigan.

**B.**

We turn next to the district court's denial of Ninsawat's motion for a *Franks* hearing. The Fourth Amendment restates the centuries-old "right of the people to be secure in their . . . houses . . . and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has interpreted the Amendment to generally require a warrant for a search or seizure to be reasonable. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). And the Amendment textually requires that warrants be issued only upon a showing of "probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. Ninsawat's challenge to the search of his house centers on that final requirement. He claims Special Agent Alley's affidavit, which was submitted alongside the warrant application, contained false statements and material omissions that call the warrant into question.

*Franks* permits a defendant to mount a post-search attack on a facially valid warrant on the ground that, but for false statements or material omissions in the affidavit, the warrant would not have been issued. A defendant challenging an affidavit under *Franks* "bears a heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). We presume the validity of the affidavit and give the district court a fair amount of discretion on whether to hold an evidentiary hearing. *Id.* To receive a *Franks* hearing, Ninsawat was required to 1) make a substantial preliminary showing that Alley knowingly, intentionally, or recklessly included a false statement or material omission in the affidavit, and 2) show that the false statement or material omission is

necessary to the probable cause finding in the affidavit. *United States v. Young*, 847 F.3d 328, 348–49 (6th Cir. 2017).

We agree with the district court that Ninsawat was not entitled to a *Franks* hearing because he fails to make a substantial showing that Alley's affidavit contained false statements or material omissions.

As an initial matter, Ninsawat claims Alley knowingly made a false statement when he asserted a belief that Ninsawat retained electronic devices with images of MV-1. That statement was false, according to Ninsawat, because Alley knew from his review of the Instagram messages that any suspect images were sent using Instagram's Vanish Mode feature, which means that "no images or pictures were created nor existed." Opening Br. at 36. But other information contained in the affidavit—information that Ninsawat does not claim is false—demonstrates that his argument misses the mark.

For one, there is no serious dispute that images of MV-1 "were created" and sent to Ninsawat. That much was clear from the summary of MV-1's own testimony provided in the affidavit and the Instagram messages quoted at length by Alley. Evidence disclosed in the affidavit also indicated that Ninsawat saved some of those images. In one Instagram exchange quoted in the affidavit, Ninsawat acknowledged possessing at least 48 explicit images of MV-1. In other messages, Ninsawat likewise acknowledged the existence of the stored images, as well as his viewing of those images at various points for his own sexual gratification.

That Ninsawat claimed he would delete the images does not render false Alley's statement that he believed Ninsawat retained electronic devices with images of MV-1. Alley explained that, based on his training and experience, "the majority of individuals who collect child pornography rarely dispose of their sexually explicit materials . . . . They almost always maintain their

collections in the privacy and security of their own homes." Affidavit, R. 43, PageID 174. And even if Ninsawat had deleted all images of MV-1, the affidavit demonstrated a good-faith belief that evidence of those images could still be recovered. *See, e.g.*, *id.* at PageID 176 ("[F]iles or remnants of such files can be recovered months or even years after they have been . . . deleted."). Put simply, Ninsawat has not made a substantial showing that Alley lied to the Magistrate when he said he believed that Ninsawat retained devices with images of MV-1.

Ninsawat also claims Alley omitted material information by failing to mention Ninsawat and MV-1's use of Instagram's Vanish Mode feature. But Alley's affidavit did disclose this fact to the Magistrate. It quoted at length numerous message chains that disclosed either Ninsawat or MV-1 "[s]en[t] a Disappearing Message. The content of this message is no longer available to be viewed." As the district court recognized, the feature was "readily understandable on its face by any magistrate reasonably familiar with the meaning of the words 'message' and 'disappear.'" Order, R. 54, PageID 356. And in any event, we agree that further elaboration on the feature would have been "inconsequential" in the probable cause analysis in light of the other information suggesting that Ninsawat had preserved images of MV-1 through screenshots. *Id.* The district court, therefore, did not err in denying Ninsawat's motion for a *Franks* hearing.

## C.

We turn next to Ninsawat's argument that the United States failed to introduce sufficient evidence for a reasonable juror to find him guilty of counts one, two, four, five, six, and seven of the Indictment, which charged Ninsawat with violations or attempted violations of 18 U.S.C. § 2251(a) and 18 U.S.C. § 2422(b). Once again, we review the sufficiency of the prosecution's proof de novo, *Howard*, 621 F.3d at 459, and ask whether any rational trier of fact could have found the elements of the offenses charged beyond a reasonable doubt, *Jackson*, 443 U.S. at 313–

We view the evidence in the light most favorable to the United States and give it the benefit of all reasonable inferences. *Fekete*, 535 F.3d at 476.

As relevant here, to establish a violation of § 2251(a), the United States was required to prove that Ninsawat employed, used, persuaded, induced, enticed, or coerced MV-1 "to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct." Similarly, to establish a violation of § 2422(b), the United States was required to prove that Ninsawat persuaded, induced, enticed, or coerced MV-1 to engage in sexual activity that is prohibited by § 2251(a). For counts four and five, the United States was required to prove Ninsawat attempted to engage in the conduct proscribed by those two statutes.

Relying on *United States v. Streett*, 83 F.4th 842 (10th Cir. 2023), Ninsawat claims that to be convicted under § 2251(a) and § 2422(b), the government was required to prove not just that he asked MV-1 for sexually explicit photographs, but also that he overcame MV-1's resistance to producing those photographs using physical or psychological pressure. In other words, in his view, all of the actions prohibited by either § 2251(a) or § 2422(b)—employs, uses, persuades, induces, entices, or coerces—require proof that his requests overcame MV-1's will. The government's evidence, he claims, was therefore insufficient because it showed that MV-1 was already willing to send him explicit photographs, and the evidence showed nothing more than a mere request for photographs MV-1 was already willing to send. We disagree.[2]

---

[2] Before addressing Ninsawat's arguments head on, we first pause to clarify the scope of the relevant statutes of conviction. In his briefs, Ninsawat treats the scope of conduct covered by § 2251(a) and § 2422(b) as if they were identical. But while both statutes share a list of common verbs (persuades, induces, entices, or coerces), § 2251(a) sweeps more broadly and also includes the verbs "uses" and "employs." That variation is potentially significant, as we have already held a defendant "uses" a minor within the meaning of § 2251(a) even if there is no evidence that the defendant overcame the minor's will. *See United States v. Wright*, 774 F.3d 1085, 1089–91 (6th Cir. 2014). Here, however, we need not separately construe § 2251(a) because there was sufficient evidence for the jury to conclude Ninsawat committed conduct captured by the shared verbs.

As an initial matter, *Streett* is not directly on point because the Tenth Circuit panel there interpreted only the verb "persuade." The panel itself recognized that the other verbs used in § 2251(a)—and by implication, the overlapping verbs in § 2422(b)—could very well be satisfied by a mere request for photographs without any evidence that the defendant overcame the minor's will. *See* 83 F.4th at 853–54 & n.8. Indeed, this court's own precedents already make clear that not all the verbs in § 2251(a) require proof that the defendant overcame the minor's will. *See, e.g.*, *United States v. Wright*, 774 F.3d 1085, 1089–91 (6th Cir. 2014) (holding a defendant "uses" a minor to produce visual depictions when he takes pictures of the minor, even if the minor initiates the nude photography sessions). What's more, *Streett*'s construction of the relevant verbs is not necessarily representative of the most natural or mainstream reading of those terms. Several circuits recognize that a defendant can persuade, induce, entice, or coerce a minor within the meaning of § 2251(a) or § 2422(b) without demonstrating that the defendant overcame the minor's will. *See, e.g.*, *United States v. York*, 48 F.4th 494, 499–501 (7th Cir. 2022); *Zupnik*, 989 F.3d at 654; *United States v. Peterson*, 977 F.3d 381, 389–90 (5th Cir. 2020).

In any event, we need not resolve whether some of the statutory verbs, like persuade or coerce, require proof that the defendant overcame the minor's will.[3] That's because other verbs in § 2251(a) and § 2422(b) do not contain such a requirement, and there was sufficient evidence for the jury to conclude Ninsawat engaged in that conduct.

Take, for example, § 2251(a) and § 2422(b)'s prohibition on "entic[ing]" a minor to engage in covered sexual conduct. At the time both statutes were enacted, the term "entice" was widely

---

[3] We concede that the term "coerce" may very well include such a requirement. *See, e.g.*, *Coerce*, Black's Law Dictionary (6th ed. 1990) ("Compelled to compliance"); *Coercion*, Black's Law Dictionary (6th ed. 1990) ("to compel act against one's will" or force "other to do what his free will would refuse").

understood (in its legal sense) to encompass "wrongfully soliciting" another to engage in certain conduct, particularly in the context of soliciting an individual to engage in sexual activity. *See, e.g., Entice*, Black's Law Dictionary (6th ed. 1990) (defining as "[t]o wrongfully solicit" and providing, as an example, that "[e]nticement of a child is inviting" the child "to commit an unlawful sexual act"); *Entice*, Black's Law Dictionary (5th ed. 1979) (same); *cf. United States v. Hansen*, 599 U.S. 762, 770–78 (2023) (interpreting the term "induce"—a verb also found in § 2251(a) and § 2422(b)—to refer to criminal solicitation, and referring to a statute that includes the verb "entice" as a solicitation offense).[4]  Anyone familiar with the prosecution of persons for soliciting a prostitute knows one can, of course, solicit or invite an individual to engage in conduct even when that person already holds themselves out as willing to engage in the conduct.  Also, one can be guilty of solicitation without any evidence regarding the solicitee's frame of mind. *See* 1 Wharton's Criminal Law § 9:10 (16th ed. 2024) ("[T]he crime of solicitation is based on the solicitor's frame of mind, not the solicitee's."); 2 W. Lafave, Substantive Criminal Law § 11.1 (3d ed. 2017) ("For the crime of solicitation to be completed, it is only necessary that the actor with intent that another person commit a crime, have enticed . . . or otherwise encouraged that person to commit a crime."); *Hansen*, 599 U.S. at 771 ("Criminal solicitation is the intentional encouragement of an unlawful act . . . . [T]he crime of solicitation is complete as soon as the encouragement occurs.").

---

[4] It's true that a version of § 2422 was originally enacted in 1910 as part of the Mann Act. *See* White Slave Traffic Act, Pub. L. No. 61–277, 36 Stat. 825, 825 (1910).  But the verb "entice" carried substantially the same meaning then. *See, e.g., Entice*, Black's Law Dictionary (2d ed. 1910) (defining as "to solicit" and providing, as an example, cases involving encouraging minors to engage in unlawful sexual activity); *Entice*, Bouvier's Law Dictionary and Concise Encyclopedia (F. Rawle ed., 1914) (providing the same definition and similar examples).

The jury, therefore, could convict Ninsawat on the § 2251(a) and § 2422(b) counts if it heard evidence indicating that Ninsawat solicited or invited MV-1 to take a picture of herself engaging in sexually explicit conduct. There was more than enough evidence introduced for the jury to so conclude here. On multiple occasions, Ninsawat requested MV-1 to capture and send visual depictions of her engaging in sexually explicit conduct. And on several of those occasions, he requested, in graphic detail, the creation of pictures or videos of MV-1 engaging in specific sexual conduct.

Consider just a few examples. Start with the conversations occurring on or about June 8, which was the subject of counts one through three of the Indictment. The day prior, on June 7, Ninsawat asked MV-1 to send a picture of her vagina while he was masturbating—a request that MV-1 resisted. But the next day, after engaging in a lengthy exchange of sexually explicit messages, Ninsawat once again asked for images of MV-1's vagina while she was masturbating, a request which MV-1 fulfilled. MV-1 testified that she produced these images at Ninsawat's request.

Ninsawat engaged in similar conduct on or about June 9, which was the subject of counts four and five of the Indictment. On that day, Ninsawat repeatedly requested that MV-1 send pictures and videos of her masturbating—requests that, contrary to Ninsawat's account, MV-1 did not appear willing to fulfill. *See, e.g.*, Trial Tr. Vol. II, R. 113, PageID 1404–05; *id.* at PageID 1407.

Finally, on or about June 20, which was the subject of counts six through eight of the Indictment, Ninsawat once again enticed MV-1 to send visual depictions of her engaging in sexually explicit conduct. When MV-1 fulfilled this request, Ninsawat was apparently not satisfied, and he instructed MV-1 to send additional images in which she was to engage in sexually

explicit poses. *See, e.g.*, Trial Tr. Vol. II, R. 113, PageID 1432; Trial Tr. Vol. III, R. 109, PageID 1013–14. MV-1 testified that she produced and sent the images Ninsawat requested, and she made clear that she produced these images only to fulfill Ninsawat's request. After the request was fulfilled, Ninsawat completed the conversation by thanking MV-1 for the pictures, which he had "missed seeing" and made him "really happy." Trial Tr. Vol. II, R. 113, PageID 1433.

Accordingly, by introducing that evidence, along with other evidence and testimony of similar substance, the United States produced sufficient evidence for a reasonable juror to conclude that Ninsawat enticed MV-1 to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct within the meaning of § 2251(a) and § 2422(b).

**D.**

Finally, Ninsawat challenges the constitutionality of his sentence to 180 months' imprisonment. He claims that sentence, which was the mandatory minimum sentence under § 2251(e), violates the Eighth Amendment's prohibition on "cruel and unusual punishments." U.S. Const. amend. VIII. It does not.

Nothing in the Eighth Amendment precludes applying § 2251(e)'s mandatory term of 180 months' imprisonment to Ninsawat's offenses. "Severe, mandatory penalties . . . are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Harmelin v. Michigan*, 501 U.S. 957, 994–95 (1991). And we have already held that applying the 180-month mandatory minimum to the class of conduct covered by § 2251 does not violate the Eighth Amendment. *See United States v. Hart*, 635 F.3d 850, 859 (6th Cir. 2011). Ninsawat's sentence is constitutional.

**III.**

We affirm the district court's judgment.